IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY AND PMA MANAGEMENT CORP. | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| v. | : : | No. 21-1892 |
| ESHAI CORPORATION, dba COURIER DISTRIBUTON SYSTEMS, LLC AND COURIER DISTRIBUTION SYSTEMS, LLC, et al. | : : : : : | |
| Defendants. | : | |

**MEMORANDUM**

McHugh, J                                                                                              May 3, 2022

Defendants in this action are businesses that engaged in package delivery. The record reflects that the companies experienced rapid growth as a result of contracts with online retailer Amazon that grew to revenue of approximately $100 million in 2020. As part of that growth, Defendants entered into a series of insurance contracts that estimated premiums subject to adjustment upon later audit. Defendants' Amazon contracts were canceled in late 2020, while they faced substantial charges incurred under the policies purchased. The carriers that issued those policies have sued for breach of contract because of nonpayment of the premium, and now move for summary judgment supported by extensive documentation of the amounts owed. Defendants have responded with various arguments, but upon close review of the record, have failed to provide factual support for the positions they assert. Because the record is plain that

Defendants have failed to pay the premiums owed, and no reasonable jury could conclude otherwise, I am obligated to grant the motion for summary judgment.

**I.      Factual and Procedural Background**

**A. The Contracts**

The contracts forming the basis for this action were issued by Plaintiffs Pennsylvania Manufacturers' Association Insurance Company ("PMAIC") and third-party administrator PMA Management Corp. ("PMA") to Eshai Corporation dba Courier Distribution Systems, LLC and Courier Distribution Systems, LLC ("Eshai").

On October 15, 2018, PMAIC issued, and Defendants accepted, Workers' Compensation and Employers' Liability Insurance policies bearing Policy No. 201800 1037944A, for the policy period of 10-15-2018 to 10-15-2019 ("WC Policy A").[1] Ex. 1 to Pl. Mot. Summ. J., ECF 19-4. On October 15, 2018, PMAIC issued, and Defendants accepted, Workers' Compensation and Employers' Liability Insurance policies bearing Policy No. 2018001037944B, for the policy period of 10-15-2018 to 10-15-2019 ("WC Policy B"). Ex. 2 to Pl. Mot. Summ. J., ECF 19-5.

On November 1, 2018, PMAIC issued, and Defendants accepted, a Commercial Auto Insurance policy bearing Policy No. 151800 1037944 ("Auto Policy"). Ex. 3 to Pl. Mot. Summ. J., ECF 19-6. On November 15, 2018, PMAIC issued, and Defendants accepted, a Comprehensive General Liability policy bearing Policy No. 301800 1037944 ("CGL Policy") Ex. 4 to Pl. Mot. Summ. J., ECF 19-7.

---

[1] Defendants note that although both Defendants were parties to the policies, Eshai and Corporate Distribution Systems, LLC are separate legal entities, as Defendant Eshai is a Georgia corporation while Courier Distribution Systems, LLC is a Georgia limited liability company and operating subsidiary of Eshai. Eshai does some business as "Courier Distribution Systems." Def. Resp. ¶3, ECF 26. Regardless, the separate corporate identity of the Defendants does not affect the legal analysis here.

On October 15, 2018, PMA, Eshai and PMAIC entered into an Agreement for Third Party Claims Handling Services. *See* Agreement for Third Party Claims Handling Services ("TPA Agreement,") ex. 5 to Pl. Mot. Summ. J., ECF 19-8.

**B. The Worker's Compensation Policies**

The two Worker's Compensation Policies (A & B) had Total Estimated Annual Premiums of $2,192,823.00 and $518,840.00 at policy inception. *See* Ex. 1, 2. The estimated annual premiums were to be paid in twelve monthly installments. *See* Declaration Sheets for Policies "A" & "B" with corresponding Premium Payment Schedule, Ex. 6 to Pl. Mot. Summ. J., ECF 19-9 at 2. The policies were managed by James Blanchard, the senior operating executive or Chief Operating Officer of Eshai. James Blanchard Dep. 16:23-17:2, Ex 7 to Pl. Mot. Summ. J., ECF 19-10. Eshai agreed to pay the premiums, and utilized a third-party broker, NFP Corp. (NFP), to convey the payments.[2] Blanchard Dep. 29:1-15, 30:14-24.

According to Plaintiffs, none of the installment payments on the two Worker's Compensation policies were made. Pl. Mot. Summ. J. ¶12. Plaintiffs have supported their motion with detailed documentation about the status of the accounts, Ex. 10 to Pl. Mot. Summ. J., ECF 19-16, and attached to their reply brief is a document identifying any payments actually made and identifying amounts still outstanding, Ex. B to Plt.'s Repl., ECF 30-2 at 12-15. Defendants respond in conclusory terms that "[w]hile the payments were not timely they were, in fact paid." Def's Resp. ¶12, ECF 26; Blanchard Decl. ¶4, Ex. 2 to Def's Resp., ECF 26-2. Mr. Blanchard was deposed in this action and later filed a declaration in support of Defendant's response to the motion for summary judgment. In his declaration, Mr. Blanchard states that NFP

---

[2] Mr. Blanchard testified at his deposition: "We agreed to pay the premiums based on projected rates, i.e., Workers' Compensation rates, the general liability rates, and the auto – or the two parts of auto, auto liability and collision rates and cargo, I believe." Blanchard Dep. 30:17-21.

3

was responsible for disbursing funds to PMA on behalf of Eshai and further states that NFP had paid PMA. Blanchard Decl. ¶5. Notably, however, Defendants fail to point to any evidence in the record—such as bank statements, checks or receipts—to support this assertion. Indeed, the only evidentiary support provided by Defendants is a "summary document" purportedly generated by NFP. According to Defendants, the document indicates that the only outstanding, unpaid invoices billed by NFP to Eshai in connection with the PMA insurance policies were the claim fees pursuant to the Third Party Agreement (TPA) in the amount of $505,805.21, an amount which Eshai disputes. Blanchard Decl. ¶6, NFP Summary Document (June 8, 2020), Ex. A to Def's Resp., ECF 26-3. But this summary has not been authenticated by NFP, and as noted above, there is no underlying documentation.

During the 2018-2019 policy period, Eshai's business expanded and as a result, a mid-term endorsement was issued under Worker's Compensation "A" Policy, which expanded coverage and increased the risk, resulting in additional premiums and surcharges. Ex. 8 to Pl. Mot. Summ. J., ECF 19-11. Eshai understood that PMA was "estimating the payroll and that there was going to be a midterm endorsement which would take into account [Eshai's] actual payroll." Blanchard Dep. 55:16-56:4. Defendants did not pay in full the Mid Term Endorsement issued under the policies, which amounted to $434,769.00.

Significantly, Eshai's corporate representative James Blanchard testified at deposition that "I didn't have any problem with the calculations of the premiums that they eventually came up with." Blanchard Dep. 51:22-24.[3]

---

[3] When asked, "You believe you have no basis for disputing these numbers; is that right?" Mr. Blanchard responded, "Correct." Blanchard Dep. 54:7-9. When asked, "Well, wasn't it your understanding that the agreement that you had with PMA that you were estimating the payroll and that there was going to be a midterm endorsement which would take into account your actual payroll?" Mr. Blanchard responded, "Oh. Correct." Blanchard Dep. 55:16-21.

Defendants selected the Retrospective Rating Plan for the two Worker's Compensation Policies ("WC Policy A" & "WC Policy B,") effective October 15, 2018, which was signed by Blanchard. *See* Signed Plan Selection Form effective 10/15/18, Exhibit 9 to Pl. Mot. Summ. J., ECF 19-15; Blanchard Dep. 56:14-18.

The Plan Selection form explicitly stated:

1. The choice of a plan will result in an adjustment of the audited premium based upon incurred losses, which include Allocated Loss Adjustments Expenses ("ALAE"), during the policy period;

2. Retrospectively rated insurance policies are subject to multiple annual calculations and/or adjustments which may result in additional or return premium. The ultimate premium payable will be determined solely by the Company based upon the calculation of incurred losses, which include ALAE, and audited payrolls relating to the Policy period;"

3. The advance premium of $2,627,946 for the Policy is merely an estimate of the ultimate retrospective premium payable by the insured(s) to the Company"

*See* Exhibit 9 to Plt.'s Mot. Summ. J at 2, ECF 19-5.  In summary, this plan permitted PMAIC to bill for the premiums for the relevant policy period after processing claims for that period.

Although Eshai admits that it selected the retrospective rating plan, it asserts that it was assured by representatives of both PMA and NFP that the maximum exposure was limited and in part would in part be used in a renewal calculation for the subsequent coverage period. Blanchard Decl. ¶7, Ex 2 to Def's Resp., ECF 26-2, Def's Resp. ¶16.  Eshai identifies some language that would appear to set a maximum rate of exposure relative to payroll but does not point to evidence in the record that the amount of the maximum exposure was in fact capped, or any evidence demonstrating that such a cap was exceeded.[4]

### C. Workers' Compensation Audited and Retrospectively Based Premiums

---

[4] The Retrospective Rating Plan includes a maximum payroll factor of 23.313 per $100 payroll, Ex. 9, ECF 19-15 at 1, and the plan includes the specific language that the maximum premium equals the audited premium at the preliminary adjustment, *id.* at 2.

In accordance with the Worker's Compensation policies, audits were conducted, a fact that Defendants do not dispute. Blanchard Dep. 72:11-13. The final audit on the "A" Policy determined an additional premium due and owing of $2,114,563.00, and the final audit on the "B" determined an additional premium due and owing of $510,311.00. *See* Audit Adjustment Summary of Worker's Compensation Final Audits on Policies A & B, Ex. 11 to Pl. Mot. Summ. J., ECF 19-17.  Pursuant to the terms and conditions of the two Workers' Compensation policies and the signed Plan Selection Form, PMAIC calculated the 1st Retrospective Adjustment for the combined A&B Policies based upon the incurred losses on claims filed by Eshai's injured workers which determined that Eshai owed PMAIC an additional retrospective premium in the amount of $4,709.061.00. *See* 1st Retrospective Adjustment Summary, Ex. 10 to Pl. Mot. Summ. J. at 3.  The amounts due and owing pursuant to the final audits on both the "A" & "B" Workers' Compensation Policies and the 1st Retrospective Adjustment total an amount due and owing to PMAIC of $7,333,935.00. *Id.* at 2.

Although Defendants do not dispute the original policy premiums, they appear to dispute the additional retrospective adjustments.  Once again, however, during the deposition of Mr. Blanchard, he conceded that he "didn't do any calculations, or look at any documents, or have any documents which would tend to indicate that [the audits] were incorrect[.]" Blanchard Dep. 72:24-73:5.  Moreover, he testified that Eshai "didn't have any problem with the calculations of the premiums" except with respect to the increase in claim management dollars under the TPA. Blanchard Dep. 51:13-24.

Defendants' principal objection to the retrospective adjustments is that "the audit and retrospective amounts totaling $7,333,935.00 are due, in large part, to the poor performance of PMA management."  Def's Resp. ¶21. Specifically, Eshai contends that the "additional claims

6

management amounts assessed as PMA Management failed to provide any additional resources, plans, actions or resolution to the subpar claims management performance throughout the policy period that resulted in additional unsupported assessments against Eshai." Def's Resp. ¶21. But Defendants have neither filed a counterclaim nor set forth as an affirmative defense any failure on the part of the Plaintiffs to perform under the contracts. Nor have Defendants made any attempt to quantify any amount that they contend would not have been owed had claims been managed more efficiently.

### D. Commercial Auto Insurance Policy & Comprehensive General Liability Policy

The premium for the Commercial Auto Insurance policy that PMAIC issued and Defendants accepted was $2,315,183.24. ECF 1, ¶42, ECF 6 ¶42, Def's Resp. ¶24.  And the premium for the Comprehensive General Liability Policy that PMAIC issued and Defendants accepted was $14,549.00.  ECF 1 ¶44, ECF 6 ¶44, Def's Resp. ¶27.  Plaintiffs argue that Defendants failed to pay the full premium for the auto policy and therefore, PMAIC is entitled to the remaining payments in the amount of $378,613.55.[5]  Plt's Mot. for Summ. J at ¶26.  Eshai responds that "[a]ccording to an accounting provided by NFP, Eshai did, in fact, pay the Auto policy in full." Def.'s Resp. at ¶25.  However, the only document in evidence that was purportedly provided by NFP shows a charge of $332,553.00 on the auto policy set against a credit from an unidentified source.  Ex. A to Def's Resp.  Defendants do not point to any evidence in the record beyond that single summary document for which there appears to be no foundation in fact.  *Id.*  With respect to the Comprehensive General Liability, PMAIC conducted an audit of the CGL policy, ECF 1

---

[5] Plaintiffs emphasize that Blanchard explicitly stated during his deposition that the *only dispute...*with the suit...filed and the dollar amounts...quantified is the fact that PMA continued to wait to increase claims management dollars..." and nowhere in Blanchard's deposition did he dispute the premium owed under the Commercial Auto Insurance policy. Plt.'s Mot. for Summ J. at ¶25 (emphasis added) citing Blanchard Dep. 51:13-24.

¶44, ECF 6, ¶44, which determined that additional premiums were due under the CGL policy, ECF 1, ¶46, CGL Final Audit, Ex. 12 to Plt. Mot. for Summ. J., ECF 19-18; Def's Resp. at ¶ 27-28.  The premium for the CGL policy was not paid in full, and Eshai once again admits that it does not have any basis to dispute the unpaid premium amount of $22,601.46 under the policy. Blanchard Dep. 91:4-13, Def's Resp. at ¶29-30.

### E. Third Party Handling Agreement

Eshai also entered into an Agreement for Third Party Handling Services with PMA and PMAIC. *See* Ex. 5 to Plt. Mot. for Summ. J; Blanchard Dep. 60:18-61:21.  As the COO of Eshai Corporation, Blanchard understood that he was signing the contract on behalf of Eshai Corporation, such that Eshai would be bound by the terms of the agreement. *Id.* According to that agreement, Eshai selected PMA as its Third-Party Administrator for the term of October 15, 2018, to October 15, 2019.   In return for Management Care Services, Eshai agreed to pay fees and costs to PMA as set forth in a Fee Schedule.  *See* Ex. D to TPA Agreement.  Blanchard admits that the amount for Third Party Handling Services "was increased on one or two occasions" which Plaintiffs attribute to the increased number of Eshai employees, resulting in an increase in claims and therefore an increased need for claims management.[6]  Blanchard Dep. 62:20-63:6.

Although Defendants admit to entering the TPA, Defendants argue that PMA required Eshai to accept the TPA agreement to bind coverage, and although PMA assured Eshai that it

---

[6] When asked whether he agrees that an increase in employees would result in an increase in claims, Mr. Blanchard testified "I would agree that all increases whether it was the number of automobile units or the number of employees, it will likely have an increase in the activity or the number of events that occur with a policy." Blanchard Dep. 62:20-63:6.

would provide better performance than any outside administrator, it failed to do so. Def's Resp. at ¶31; Blanchard Decl. ¶10.[7]

Plaintiffs have moved for summary judgment on two counts of their Complaint: Count I, alleging that Defendants failed to pay premiums under the four contracts of insurance, and Count II, alleging that Defendants failed to pay fees owed under the Third Party Handling Agreement.

## II. Legal Standard

This motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III. Discussion

i. Summary Judgment is Warranted as to Count I because the undisputed evidence of record establishes that Defendants have Breached All Four Insurance Contracts

To establish a breach of contract claim, the plaintiff must allege, "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225 (3d Cir.2003); *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (relating to breach of a mortgage contract). Because there is no material dispute as to 1) the existence of the contracts between Plaintiffs and Defendants, 2) that Defendants breached their duty by failing to pay

---

[7] During his deposition, Mr. Blanchard discussed Eshai Corporation's frustration with PMA's claim management process because from Blanchard's perspective, claims were not getting closed quickly enough which resulted in additional costs for Eshai. Blanchard Dep. 63:21-65:11

Blanchard reports that "the constant communication from claims management at PMA was, in fact, we can't handle the frequency of the claim activity, you know, because they were under water. They didn't have enough resources committed to this and I went to the broker and had several conversations and said what are you guys going to do about that... [M]y only big dispute with the suit [filed by PMA] is the fact that PMA continued to want to increase claims management dollars because there is no TPA." Blanchard Dep. 51:3-15. It is unclear what Mr. Blanchard means when he states "there is no TPA" given that he signed the Third Party Agreement.

plaintiffs in the amounts owed, and 3) the resultant damages, Plaintiffs are entitled to summary judgment.

First, there is no dispute that Defendants signed four insurance contracts: Workers' Compensation Policy A, Workers' Compensation Policy B, a Commercial Auto Insurance Policy, and a Comprehensive General Liability Policy, nor that the total estimated annual premiums for the Workers' Compensation Policies were $2,192,823.00 and $518,40.00 at policy inception. *See* Ex. 1-4 to Pl.'s Mot. Summ. J. Furthermore, there is no dispute that Defendants selected the Retrospective Rating plan for the Two Worker's Compensation Policies, or that a mid-term endorsement was issued under the Worker's Compensation Policy A. *See* Ex. 8, 9 to Pl. Mot. Summ. J.

As set forth above, Defendants nonetheless argue that there are material disputes precluding summary judgment. To support this assertion, they rely on the NFP "summary document," Mr. Blanchard's deposition, and his supplemental declaration that largely contradicts his earlier sworn testimony. For its part, "[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings [but instead] must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014) (cleaned up).

To substantiate their claim that the Workers' Compensation payments were paid, Defendants cite to two lines from Mr. Blanchard's declaration which read: "While the payments were not timely they were, in fact, paid," and "Eshai's insurance broker of record, NFP, was responsible for disbursing funds to PMA on behalf of Eshai and claimed that they had paid

PMA."[8] Blanchard Decl. ¶¶ 4,5.  There are no depositions of NFP employees or affidavits from them to substantiate the allegation that NFP "claimed" that "it had paid PMA."  Moreover, Blanchard's statement contradicts his earlier deposition testimony, in which he testified that the payments were never made.  In fact, Blanchard admitted that he "absolutely made those decisions...not to pay invoices for PMA" because of Eshai's cash flow issues. Blanchard Dep. 45:12-46:13.

Blanchard's belated declaration on Eshai's behalf, already "subject to the infirmity of any self-serving declaration," *see Korn v. Korn,* 398 F.2d 689, 691 (3d Cir.1968),  cites only to the one-page "summary document" titled "Eshai Outstanding Premium Summary," which purportedly shows that "the only outstanding, unpaid invoices billed by NFP to Eshai in connection with the PMA insurance policies was the additional billed TPA Agreement fees charged by PMA in the amount of $505,805.21, which Eshai disputes," Blanchard Decl. at ¶6; Ex. A to Def's Resp. [9]  This "summary document" was neither referenced by Blanchard during his deposition nor produced until Defendants filed their response in opposition to Plaintiff's motion for summary judgment, and as noted above lacks any apparent foundation.

---

[8] To the extent that Defendants rely on purported failings by NFP. there is no evidence in the record that NFP was an agent of the insurer such that their mistakes or violations could be attributed to Plaintiffs. Indeed, references to supposed statements by NFP would, in addition, constitute inadmissible hearsay. S*telwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 n. 17 (3d Cir. 1995) (reasoning that at the summary judgment stage, Courts may only consider hearsay statements that would be capable of admission at trial.)

[9] In their reply brief, the Plaintiffs correctly note that "[t]he 'declaration' and 'summary from NFP' also directly contradict th[e] invoices for outstanding amounts due and owing for the policies which were provided directly to James Blanchard by PMA four month after the purported 'summary' was generated." Plaintiffs rely on emails sent from PMA to James Blanchard dated 9/24/2020 and to Mark Wiemold of NFP dated 10/6/2020, which Plaintiffs attach to their reply brief.  *See* Plt.'s Repl. (emphasis in original); Ex. 1 to Plt.'s Repl.

Defendants' arguments that the adjusted premiums, Mid Term Endorsement Audits and the Retrospective Adjustment are incorrectly calculated, also fail. As an initial matter, during his deposition testimony, Blanchard did not dispute the amount of money due and owed to Plaintiffs by Eshai, which NFP was advised in December 2019 equaled $935,845.00 for premiums, not including audits or retro assessments. *See* Sally Troutman Decl ¶6, Ex. 2 to Plt's Repl. In fact, as previously stated, during Blanchard's deposition testimony, he testified that his "only big dispute with the suit [that was] filed [by plaintiffs] and the dollar amounts that [plaintiffs] quantified is the fact that PMA continued to want to increase claims management dollars because there is no TPA... [He] didn't have any problems with the calculations of the premiums that [plaintiffs] eventually came up with." Blanchard Dep. 51:13-24.

The fact that the Defendants now argue that the premiums were incorrectly calculated by attaching a declaration from Blanchard appears to be a last-ditch effort to raise an issue of material fact to preclude the grant of summary judgment. Again, the Court is confronted with a situation where the Defendant's declaration is inconsistent with his prior statements about the premiums owed. The Third Circuit has remarked that "[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackerman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991); *see also Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999) ("A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d

703 (3d Cir.1988); *Starr v. Katz,* CIV. A. 91–3365, 1994 WL 548209 (D.N.J. Oct.5, 1994) (The "testimony of the non-movant does not raise an issue of fact when, without explanation, it contradicts his other statements in the record."). Given this precedent, and Blanchard's prior deposition testimony, the Court disregards his declaration.

Although Defendants admit that audits were conducted in accordance with the policy, Def's Resp. ¶ 19, and have pointed to no evidence in the record to counter the additional premiums of $2,114,563.00 under the "A" Policy and 510,311.00 under the "B" policy, they apparently seek to excuse their failure to pay the audited amount by arguing that "the audit and retrospective assessments totaling $7,333,935.00 are due, in large part, to the poor performance of PMA management." Def's Resp. ¶ 21. As Plaintiffs correctly point out, this argument has no direct bearing on the contractual right of Plaintiffs to assess the premiums and Defendants' corresponding obligations to pay the premiums. The only evidence of record is that Defendants entered into an agreement with PMA where there was an estimated payroll and a midterm endorsement that would take into account Eshai's actual payroll. Blanchard Dep. 55:16-24.

Defendants' principal argument with respect to the retrospective rating plan appears to be that Eshai was assured by PMA and NFP that the maximum exposure was limited. Blanchard Decl. ¶7, Ex 2 to Def's Resp., ECF 26-2, Def's Resp. ¶16. Again, Blanchard raises this contention in his post-deposition declaration without demonstrating where in the record there is evidence to substantiate his claim that there was an such an agreement.[10] Nor is there any reference to the record in support of Eshai's argument that it was assured that the maximum

---

[10] If Defendants are referring to the language in the Retrospective Plan Selection Form as to the maximum payroll factor of 23.313 per $100 payroll, Ex. 9, ECF 19-15 at 1, and the fact that the maximum premium equals the audited premium, *id.* at 2, they have failed to develop this argument with any clarity, and failed to show that Plaintiffs' calculations improperly exceeded the limit.

exposure "would be used in a renewal calculation for the subsequent coverage period." Blanchard Decl. ¶7

Furthermore, there is no dispute that Defendants entered into a Retrospective Rating Plan in which the advance premium was "merely an estimate of the ultimate retrospective premium payable by the insured(s) to the Company" and the "ultimate premium payable will be determined solely by the Company based upon the calculation of incurred losses…and audited payrolls relating to the Policy period." Exhibit 9 to Plt.'s Mot. Summ. J at 2-3.  Given the clear and unambiguous language that the company – and not the insured party – determined the ultimate premium payable, there is no dispute that Plaintiffs had authority to calculate the premium amount.

With respect to the Commercial Auto Insurance Policy, Defendant's unsupported assertion that "[a]ccording to an accounting provided by NFP," Eshai paid the auto policy in full, Def.'s Resp. at ¶25, does not raise a dispute of material fact without corresponding support in the record.  And there is no evidence that Defendants paid the remaining auto policy payments in the amount of $378,613.55.  As to the Comprehensive General Liability Policy, Eshai does not dispute that it owes $22,601.46.

In summary, there is ample evidence in the record that Defendants have breached their agreements under the four insurance contracts. Because Defendants have failed to identify any disputes of material fact, Plaintiffs are entitled to summary judgment on Count I in the amount of $8,169,919.01. This amount includes $434,769 for the mid-term endorsement, $7,333,935.00 pursuant to the Final Audits on both the "A" & "B" Workers' Compensation Policies and the 1st Retrospective Adjustment, $378,613.55 pursuant to the remaining payments on the auto policy, and $22,601.46 for the CGL policy.

      ii.      <u>Summary Judgment is Warranted as to Count II Because the Undisputed Evidence of Record is that Defendant Violated the Third Party Agreement.</u>

There is no dispute that Eshai entered into an Agreement for Third Party Handling Services with PMA and PMAIC, *see* ex. 5 to Plt. Mot. for Summ. J; Blanchard Dep. 60:18-61:21, whereby Eshai agreed to pay fees and costs to PMA as set forth in a Fee Schedule in return for Management Care Services, *see* Ex. D to TPA Agreement. Moreover, there is no dispute that Eshai did not pay in full the amounts reflected on the Statement for TPA Services, in the amount of $447,315.73, thereby breaching its contract. *See* Ex 13 to Def. Mot. Summ. J, ECF 19-9.

Although Defendants raise a series of arguments as to the ineffectiveness of the claim management services, they have not set forth a legally cognizable defense to avoid the conclusion that they are in breach of the TPA Agreement.[11]

---

[11] It is not clear what Defendants refer to when they argue that "the additional expense and an ongoing request by the Plaintiffs for additional claims management fees was not part of the original proposal" nor what relevance this has to the binding nature of the TPA. To the extent that Defendants are making reference to the fact that the TPA was amended to include the language: "[a]dditional claim handling fees in the amount of $339,105 shall be billed by PMA to Client in six equal installments" and "Record Only claims shall be reconciled at a rate of $45.00 per claim," Defendants have not raised any allegations that the amended agreement was not binding. ECF 19-8.

Defendants make vague statements of a general nature such as "when claims management is tardy, and claims increase as a result, then PMA's retro premium was most likely calculated based on PMA's inability to execute and close claims in a timely manner." Defendants do not explain how that would relieve them of their obligations under the contracts at issue.

**IV.     Conclusion**

For the reasons discussed above, I will grant Plaintiffs' Motion for Summary Judgment. Plaintiffs are entitled to $8,169,919.01 on Count I, and $447,315.73 on Count II. An appropriate order follows.

   /s/ Gerald Austin McHugh
United States District Judge