# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA MANUFACTURERS'** | : | |
| **ASSOCIATION INSURANCE** | : | |
| **COMPANY**, *et al.* | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 21-1892** |
| | : | |
| **ESHAI CORPORATION**, *et al.* | : | |

**McHUGH, J.**                                                              **August 5, 2025**

## MEMORANDUM[1]

      This is an action to recover unpaid insurance premiums against the shareholders of Eshai Corporation, a package delivery business. Summary judgment was entered in favor of the Plaintiff carriers, who now seek to collect by piercing the corporate veil. In 2015, Eshai Corporation executed a contract with Amazon, spurring rapid growth. As part of that growth, Eshai Corporation entered into a series of retrospectively rated insurance contracts, a type of insurance where the final premium owed is subject to adjustment based on the insured's actual losses during the policy period. In July 2020, Amazon terminated the contract, forcing Eshai to wind up its affairs. Two months later, the carriers issued a $7 million retrospective adjustment. Soon thereafter, the carriers brought a breach of contract action, alleging that Eshai Corporation failed to pay the premiums owed. In 2022, I granted summary judgment for the carriers, who now seek to hold the shareholders personally liable for the debt. The parties previously filed cross motions for summary judgment, but in the presence of numerous factual disputes I denied the motions and with the parties' consent convened an evidentiary hearing. Following a careful review of the

---

[1] The discussion of the evidence set forth herein and the analysis of precedent cited by the parties represents the Court's findings of fact and conclusions of law.

record, I am constrained to conclude that the carriers have not met the stringent standard required to pierce the corporate veil.

## I.    Relevant Background

### A.    Eshai Corporation: A swift rise and sudden fall

Eshai Corporation was formed in July 2013 as a package delivery business.  Najeeb and Rubina Eshai and two of their children, Usman and Ali, served as shareholders.[2]  Usman was the company's dominant shareholder, owning 68.1% of Eshai Corporation's stock.  Ali owned 15.7%, Najeeb owned 0.5%, and Rubina owned 15.7%.[3]  Day One Hearing Tr., ECF 93 at 18:25–19:17.

In 2015, Eshai Corporation entered into an agreement with Amazon, whereby Eshai would provide delivery and distribution services exclusively to Amazon.  Over the next few years, Eshai Corporation formed several affiliated companies – many of which also serviced Amazon – including Deliverol Global Inc. ("Deliverol"), Postal Mile, CDS Staffing LLC, CDS Courier Distribution Systems LLC, CDS Transnet LLC,[4] Final Mile, Final Mile Holdings LLC, Last Mile Staffing LLC, Allpoints Trucking & Courier Service Inc. ("Allpoints"), and Endol Global Technologies.[5]  *See* ECF 93 at 52:19-22; 54:23–55:23.  Eshai Corporation and many of the

---

[2] I will use the first names of the individual defendants (all of whom have the last name "Eshai") to avoid conflating them with Eshai Corporation, the corporate entity.

[3] Rubina is not a defendant to this action.

[4] Usman testified that CDS Transnet was a rush delivery service for "high value" pharmaceuticals and life-saving medications.  Day One Hearing Tr., ECF 93 at 65:10–66:8.  CDS Transnet was formed by Usman and Ali around 2010 in Wisconsin.  Ali Dep. Tr. 30:14–31:8, ECF 70-12.  In December 2019, Eshai Corporation sold its ownership interest in CDS Transnet to Auctus, a German private equity firm.  Auctus obtained 55% of the new company while Usman retained 45%.  ECF 93 at 66:9–67:1.  Usman remains the CEO of CDS Transnet.  *Id.* at 66:13–67:9.

[5] Some of the Amazon companies were wholly owned subsidiaries of Eshai Corporation, including Final Mile, LLC.  *See* ECF 93 at 158:2-3.  Payroll companies CDS Courier Distribution Systems, LLC (*id.* at 107:11-13) and CDS Staffing (*id.* at 20:1-6) were also wholly owned by Eshai Corporation. (CDS Staffing appears to have been a California-specific payroll company.  *Id.* at 56:7-19).  Deliverol was owned by Ali Eshai and Postal Mile was owned by Najeeb Eshai.  *Id.* at 158:1-3.  Cartage Services ("Cartage") contracted with DHL and was the only affiliated entity that serviced a client other than Amazon.  *Id.* at 130:1–132:8

affiliated entities were insured by Plaintiff Pennsylvania Manufacturers' Association Insurance Company ("PMA").[6]

From 2015 through the middle of 2020, Eshai Corporation experienced rapid growth, with revenue across the integrated enterprise exceeding $100 million in 2019.  ECF 93 at 219:4-6.  Nonetheless, in many respects because of the rapidity of the growth, the companies faced persistent cash flow issues due to increased payroll costs, vehicle expenses, and high interest loan repayments.[7]  *Id.* at 208:25–212:7; 191:23–193:7.

On July 17, 2020, Amazon notified Eshai Corporation and the affiliated entities that it was terminating their relationship.[8]  *Id.* at 100:12-20; 219:18–229:3. Having lost its sole client, Eshai Corporation was compelled to wind up its affairs.[9]  *Id.* at 100:21–101:10.  Then, on September 24, two months into the liquidation process, PMA issued a $7.3 million retrospective premium adjustment.  *See* Retro Adjustment Bill, ECF 19-16 at 2.  Eshai Corporation failed to render payment.

### B.  The Insurance Contracts

The insurance policies that form the basis for this action were issued to Eshai Corporation and several of its affiliated entities in 2018.  They include two workers' compensation policies, a

---

(Ali testimony).  Cartage was owned by Deliverol.  *Id.* at 158:10-12.  Usman testified that "nothing ever happened" with Endol Global Technologies.  *Id.* at 55:12-13.

[6] PMA insured CDS Staffing, Courier Distribution Systems, Deliverol, Postal Mile, Endol, Allpoints, Final Mile LLC, Final Mile Holdings, and Last Mile Staffing.  Defs. Trial Ex. 1.

[7] For instance, in 2019, Eshai Corporation obtained a $1 million loan from Georgia United, on which the company paid 33% ($28,000 a month) in interest.  ECF 93 at 78:10–79:18.

[8] In their motion for summary judgment, Defendants stated that Amazon terminated the relationship in August.  ECF 70-2 at 6.  But at the hearing, Usman testified that he received notice of the termination on July 17.  ECF 93 at 100:12-20.

[9] Usman testified that Eshai Corporation resolved its obligations with every creditor except for PMA.  ECF 93 at 104:6-19.

commercial auto insurance policy, and a comprehensive general liability policy. The parties also entered into an agreement for third party claims handling services.

Workers' Compensation Policies. On October 15, 2018, PMA issued two Workers' Compensation and Employers' Liability Insurance policies for the period of October 15, 2018 to October 15, 2019 ("Policy A" and "Policy B").[10] ECF 19-4 (Policy A); ECF 19-5 (Policy B). The two policies had total estimated annual premiums at inception of $2,192,823.00 and $518,840.00, respectively. ECF 19-4 at 10; ECF 19-5 at 6. Eshai Corporation selected the Retrospective Rating Plan for the two policies, authorizing PMA to adjust the premium based on the actual losses incurred during the policy term. *See* ECF 19-5 at 30-33; Plan Selection Form, ECF 19-15.

In accordance with the policies, PMA conducted an audit of Eshai Corporation's records. The final audit on Policy A determined an additional premium of $2,114,563.00, and the final audit on Policy B determined an additional premium of $510,311.00. Audit Summary, ECF 19-17. PMA also calculated a Retrospective Adjustment for the combined A and B Policies based upon the incurred losses on claims filed by Eshai Corporation's injured workers and determined that the company owed PMA an additional retrospective premium in the amount of $4,709.061.00. ECF 19-16 at 3.

In sum, following the audits, Eshai Corporation owed PMA $7,333,935.00 for the retrospective adjustment.[11] *Id.* at 2.

Auto and General Liability Policies. On November 1, 2018, PMA issued a Commercial Auto Insurance policy for the period of November 1, 2018 to November 1, 2019. Auto Policy,

---

[10] At the end of the policy term, PMA decided not to renew, so Defendants obtained insurance from a different carrier. *See* Day Two Hearing Tr., ECF 96 at 10:19-23.

[11] Eshai Corporation also owed $434,769 for failure to pay in full the mid-term endorsement issued under Policy A. *See* Mid-Term Endorsement, ECF 19-11.

ECF 19-6.  The premium for the Auto Policy was $2,315,183.24.  *Id.*  Eshai Corporation failed to render payments on the policy in the amount of $378,613.55.

On November 15, 2018, PMA issued a Comprehensive General Liability policy for the period of November 15, 2018 to November 15, 2019.  CGL Policy, ECF 19-7.   The premium for the CGL Policy was $14,549.00.  *Id.* at 5.  Following an audit, PMA determined that an additional $22,601.46 was due.

<u>Third Party Handling.</u>  On October 15, 2018, the parties entered into an Agreement for Third Party Claims Handling Services.  TPA Agreement, ECF 19-8.  Eshai Corporation failed to pay $447,315.73 of the total amount reflected on the Statement for TPA Services.  *See* ECF 19-19 at 1.

In total, Eshai Corporation owed PMA over $8.6 million for (1) failure to pay premiums under the four insurance contracts, and (2) failure to pay fees owed under the Third Party Handling Agreement.

### C.  Procedural History

On May 3, 2022, I granted summary judgment for PMA on their breach of contract claims in the amount of $8,617,234.74 and ordered a period of "further discovery relevant to whether Plaintiffs can meet the stringent standard for piercing the corporate veil."  ECF 37, 38.   In July 2024, the parties filed cross motions for summary judgment as to whether it was appropriate to hold the company's shareholders personally liable for the PMA debt.  I denied the motions, concluding that dueling expert reports and ambiguous financial documents gave rise to material factual disputes.  To clarify the record, I scheduled a two-day evidentiary hearing.  Because piercing the corporate veil is a form of equitable relief, the parties have agreed that resolution of

this issue is a matter for the Court, not a jury.  Following presentation of lay and expert testimony, at the request of the parties I heard closing arguments on May 2, 2025.

## II.    Standard of Review

Under Pennsylvania law, courts consider the following factors in determining whether to pierce the corporate veil: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud." *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995).[12]  The Pennsylvania Supreme Court recently distilled the inquiry as follows: "[f]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice." *Mortimer v. McCool*, 255 A.3d 261, 286-87 (Pa. 2021) (Wecht, J.).  I agree with the Superior Court's well-reasoned decision in *In re Dravo LLC*, 307 A.3d 146 (Pa. Super. Ct. 2023), concluding that the *Lumax* factors continue to be relevant following the *Mortimer* decision: that "[a]lthough all *Lumax* factors may not be needed or relevant in each piercing the veil case, courts may still look to those factors, and the cases that applied them, for guidance when determining whether the *Mortimer* inquiry is met." *Id.* at 156.  No single factor is dispositive, and courts must assess the totality of the circumstances. *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018); *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1281 (Pa. Super. Ct. 2004).  The Pennsylvania Superior

---

[12] While Pennsylvania law controls this action, I will at times draw upon federal common law principles, because the Court of Appeals has recognized that they are "substantially similar to the principles set forth in Pennsylvania case law." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018).  The Third Circuit has identified the relevant factors as "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [the] debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001).

Court has observed on several occasions that "there appears to be no clear test or well settled rule in Pennsylvania as to exactly when the corporate veil can be pierced and when it may not be pierced." *See Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87, 95 (Pa. Super. Ct. 2007) (quoting *Adv. Tele. Sys, Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004)).[13]    Justice Wecht cogently reframed the issue in *Mortimer*, observing that "equitable doctrines [] resist reduction to prescriptive tests, tending by historical design toward holistic, case-by-case analyses," such that "[t]he issue isn't that there is no settled rule, it's that the rule is difficult to generalize." *Mortimer*, 255 A.3d at 268, 286 n.95.

There is a strong presumption against piercing the corporate veil. *Lumax*, 669 A.2d at 895. Courts "must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Mortimer*, 255 A.3d at 278 (quoting *Wedner v. Unemployment Comp. Bd. of Review*, 296 A.2d 792, 795 (Pa. 1972)).    "[L]imiting liability through incorporation is not a bug of corporate law but its defining feature." *Id.* at 277. Thus, "[c]are should be taken on all occasions to avoid making the entire theory of the corporate entity useless." *Id.* at 278; *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967); *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978).    Pennsylvania courts have not clearly articulated the burden of proof required to pierce the veil.    At least one district court in the Third Circuit has applied a preponderance standard, *see Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F. Supp. 1054, 1058 (W.D. Pa. 1990), but it is not clear to me that such a standard can be reconciled with Pennsylvania's "strong presumption" against piercing the veil.    In applying federal common law, the Third Circuit has concluded that because veil piercing has "elements of fraud theory," it "must

---

[13] The Pennsylvania Supreme Court first noted this lack of clarity in 1954. *See Barium Steel Corp. v. Wiley*, 108 A.2d 336, 341 (Pa. 1954).

be shown by clear and convincing evidence." *See Trs. of the Nat'l Elevator Indus. Pension, Health Benefit, and Educ. Funds v. Lutyk*, 332 F.3d 188, 192 (3d Cir. 2003) (citation omitted); *accord Trinity*, 903 F.3d at 366. I will therefore apply the clear and convincing standard.

## III.    Discussion

### A.    Plaintiffs have not established by clear and convincing evidence that piercing the corporate veil is justified under the circumstances.

By way of initial observation, it should be noted that Plaintiffs' case principally relies on the opinions of their forensic accountant, James Stavros. Although certainly qualified, Mr. Stavros made some significant errors in his analysis and completely dropped one of the principal criticisms of the Defendants in his report. ECF 69-2 (the "Stavros Report"). And while the forensic accountant called by the defense equivocated on some points and did not testify for long, it is Plaintiffs who carry the burden of proof, so the deficits in their expert presentation loom larger.

> *1.    Plaintiffs' expert abandoned his contention that Eshai Corporation diverted Covid relief funds to shareholders.*

Plaintiffs' most dramatic claim was that Defendants diverted $2 million of the pandemic-related Paycheck Protection Program loan to shareholders, rather than paying the liabilities and expenses of the company. *See* Stavros Report at 11; *id.* at 10-11 ("Despite Eshai's poor financial condition in 2020, they received a PPP loan for $7,084,300 in May 2020 which was immediately used to pay $763,016 in insurance premiums to a subsequent insurer, $2,128,120 of distributions went to shareholders with the balance transferred among Eshai accounts or to other related or third parties, none went to PMA."). But Stavros unequivocally withdrew this opinion during the hearing, testifying that:

> I traced the PPP loan of $7 million and it came into a Region bank account. And I was able to trace some of those payments directly into the distributions account . . . But what I didn't do, and I should have done, and I stand corrected in the G&S report and the testimony today, or yesterday, is they immediately backed that out.

8

> They immediately subtracted out the amounts that I had traced in from the PPP loan in the distribution account. So I would agree that the PPP loan, none of that directly went to the shareholders. And I should have done a better job in telling that in my report. So that was – that was – I could have done a better job.

Day Two Hearing Tr., ECF 96 at 51:5-18.

This accusation figured prominently in Plaintiffs' initial submissions to the Court, and this concession of such a fundamental error by Plaintiffs' expert substantially erodes their position.

> 2. *Eshai was not undercapitalized considering the nature of its business and rapid expansion.*

In determining whether a company is undercapitalized, courts assess the "adequacy of available capital 'measured by the nature and magnitude of the corporate undertaking.'" *Mortimer*, 255 A.3d at 269 n.17 (quoting *Anderson v. Abbott*, 321 U.S. 349, 362 (1944)). Notably, evidence of insolvency is of "little relevance" in assessing whether an entity is undercapitalized. As the Third Circuit has explained, "[c]ompanies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule." *Lutyk*, 332 F.3d at 197. Instead, "the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *Id.* For example, diversion of corporate assets to shareholders while a corporation is in financial distress may warrant piercing the corporate veil. *See United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (piercing the corporate veil justified where sole stockholder "loaned large sums to the corporation and then repaid the loans to himself with corporate funds while the corporation was failing"); *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 23 (1st Cir. 1998) ("wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress . . . can justify[] piercing the corporate veil.").

Plaintiffs contend that Eshai Corporation issued excessive shareholder distributions in 2019 and 2020, rendering the company unprepared to manage its rapid growth and the financial risk inherent to servicing a single client.  Specifically, Plaintiffs assert that Eshai Corporation experienced net income losses of $1,841,081 in 2019, and $3,613,147 in 2020, but nonetheless paid substantial cash distributions to shareholders over the same period – $2,144,898 in 2019 and $3,637,454 in 2020.  Put simply, Plaintiffs maintain that over a two-year period in which Eshai Corporation sustained $5.4 million in losses, the company disbursed $5.7 million to its shareholders.[14]

Upon careful review of the testimony and underlying financial records, Plaintiffs have not met their burden in establishing that Eshai Corporation issued excessive distributions in 2019 or 2020.  As for 2019, the distributions were not excessive; as for 2020, the record does not clearly establish that transactions categorized as "distributions" represent payouts to shareholders.

a.  The 2019 distributions were not excessive.

In 2019, following the sale of CDS Transnet, Eshai Corporation issued approximately $2.1 million in distributions to its shareholders.  That year, the company reported a capital gain of $3.8 million (from the sale of CDS Transnet), a book income of $2.1 million, and a business income loss of $1.8 million.  *See* ECF 96 at 66:21–68:13.  On this issue, the Stavros Report focused solely on the company's $1.8 million business income loss, neglecting the nearly $6 million in liquid assets when book income and capital gains were combined.  *See* Stavros Report at 3.  Mr.  Stavros testified that, in evaluating the 2019 distributions, he decided not to consider the capital gains because the sale of CDS Transnet was a "one-time thing" and "not in the operations."  ECF 96 at

---

[14] Usman, Najeeb and Ali also reported W-2 income through Eshai Corporation.  Usman received $206,179 in 2019 and $65,914 in 2020; Najeeb received $220,971 in 2019 and $74,800 in 2020; Ali received $208,714 in 2019 and $66,000 in 2020.  *See* Stavros Report, Ex. 3, ECF 69-2.

68:10–70:2. But he failed to take into consideration the fact that this was a closely held family business that had been operating over a period of years. He provided no explanation for his decision to omit the company's book income. *Id.* at 67:25–68:6.

The failure of the Stavros report to reflect both the sale of CDS Transnet and the company's book income conveys a misleading picture of Eshai Corporation's financial condition in 2019, rendering his analysis on the issue unreliable. As a preliminary matter, businesses often reflect paper losses, something that is advantageous for tax purposes, while having a healthy income stream as Eshai did in 2019. Admittedly, given the company's rapid growth, and the precarity of servicing a single client, Eshai Corporation faced a constant degree of risk, raising a question as to whether a large distribution was prudent. But that falls well short of showing an intent to defraud creditors, particularly when the 2019 distributions are viewed in context. The record reflects that Eshai Corporation's shareholders had not taken significant distributions over the first few years of the company's operations. The company disbursed $162,672 to shareholders in 2016, $211,251 in 2017, and $0 in 2018. *See* Stavros Report, Ex. 3; *see also* ECF 93 at 70:11–71:4 (Usman testimony). James Blanchard, Eshai Corporation's Chief Operating Officer, testified that the decision to issue distributions in 2019 was "all due to the sale of CDS Transnet." ECF 93 at 185:6-7. Blanchard asserted that CDS Transnet was a "separate company with a separate history" and that distributions were justified for "something [Usman and Ali] put ten years of work into." *Id.* at 184:22–185:21. Additionally, Defendants used a portion of the proceeds from the sale of CDS Transnet to pay off the Georgia United loan. *Id.* at 80:9-15 (Usman testimony); 68:3-9 (same). The disbursement of $2 million – following the $3.8 million sale of a successful company that Usman and Ali had operated for nearly a decade – cannot be viewed as improper diversion when the remainder of the funds and the net book income of $2.1 million either paid down debt or

remained in the company.  Moreover, the record contains no evidence that Defendants had reason at that point to believe Amazon was planning to terminate the contracts.

It should also be noted that during his testimony Usman repeatedly referred to Mr. Blanchard as the individual informing key business and fiscal decisions, who is neither a family member nor a shareholder.  At the evidentiary hearing, it was striking the degree to which Mr. Blanchard could answer questions about the business in far greater detail and with far greater business sophistication than members of the Eshai family.  To the extent that his business judgments were driving decisions – whether they were sound or not – his role as an advisor weighs against a finding of improper self-dealing.[15]

b. The record is insufficient to support a finding that transactions in Eshai Corporation's 2020 distributions account represent cash payments to shareholders.

Eshai Corporation's 2020 books – which were prepared "after the fact" in 2022 by an outside accounting firm – include a "distributions account" containing transactions totaling approximately $3.6 million.  The parties submitted conflicting expert reports on the significance of this account.

The Stavros report submitted by Plaintiffs concluded that Eshai Corporation issued $3.6 million to shareholders in 2020, including in the months after Amazon terminated the contract.  *See* Stavros Report at 13.  On direct examination, Stavros testified that Eshai Corporation "decided

---

[15] Plaintiffs assert that Mr. Blanchard knew Eshai Corporation would have difficulty paying the unadjusted PMA premium in December 2019 and made a conscious decision to ignore the obligation.  The record is more nuanced than that.  Blanchard acknowledged that his plan was to "slow pay" the PMA premium based on the company's cash flow issues.  ECF 93 at 187:2-18; ECF 96 at 10:13–12:14.  But that decision followed from PMA's decision not to renew, and Eshai needed a large deposit to replace the coverage on relatively short notice.  Blanchard prioritized securing new coverage, which Eshai needed to operate.  This sheds some light on Eshai's capitalization, but once again it was Blanchard rather than a member of the Eshai family making the decision, and the decision reflects business necessity far more than diversion of assets.

to pay $3.6 million of distributions in 2020 . . . irrespective of the fact that they lost their biggest client in July of 2020." ECF 96 at 47:10-13. According to Stavros, it was clear from the distributions account that Defendants "continued to pay distributions to themselves" following notice from Amazon. *Id.* at 47:14-16.

Defendants maintain that Wilson Lewis, the accounting firm, used the distributions account as a catch-all for ambiguous or improperly coded journal entries. Craig Pate, an accountant with Wilson Lewis who supervised the after-the-fact reconciliation, testified at his deposition that the firm used "distribution" as a default categorization, explaining that if an entry is "not an expense, not a reduction of liability, and [] not an asset, then it has nowhere else to go but distributions." *Id.* at 161:22-24. James Blanchard, Eshai Corporation's COO, testified to this process as well, asserting that ambiguous transactions "default[ed] to distributions." ECF 93 at 203:1-6; 196:9-14 (same). And Stavros' testimony acknowledged that the Eshai accounts were structured in an unconventional way, noting that that the distributions account included both debits and credits, *see* ECF 96 at 43:3-4; 51:23–52:12, and that, in his professional experience, "distributions accounts [] have always been one way. It's money out; it's never money in." *Id.* at 52:2-4. It should be noted that the second half of 2020 consisted of the winding down of operations for all the entities, and that the 2020 statements were prepared well after.

On cross-examination, Mr. Stavros then retreated from his assessment that the transactions in the distributions account definitively represented payouts to shareholders. Some of these entries, he explained, may have represented payments issued "*on behalf of* the shareholders," which, he conceded, could plausibly encompass payments to third parties or payment of company debt. *Id.* at 85:16-24 (emphasis added).

Following two days of testimony, I remained concerned by a lack of clarity on the issue, and instructed counsel to focus particular attention in closing argument on how to interpret the 2020 distributions account. Counsel on both sides acknowledged the obscurity in the record. Plaintiffs' counsel stated that, "[w]e don't know whether it represented cash, and [] we haven't been able to ascertain [] whether it represented cash.  We know it represented either cash or a benefit to the shareholders."  ECF 99 at 7:9-12.  Defense counsel reiterated that the decision to classify ambiguous transactions as "distributions" was an artifact of the after-the-fact accounting process and maintained that there was no evidence in the record reflecting cash payments to shareholders in 2020.  *Id.* at 39:13–41:9.

The murkiness of the record is fatal to Plaintiffs' claim.  There is little doubt that Defendants' after-the-fact bookkeeping was imprecise, but ambiguity alone does not justify piercing the corporate veil, particularly where, as here, Plaintiffs had access to pertinent financial documents from the relevant time period, including bank statements and account statements for Usman, Ali, and Najeeb regarding "any and all payments, disbursements or distributions from Eshai Corporation."[16]  Mot. to Compel, ECF 45-1 at ¶ 4; Order on Mot. to Compel, ECF 48 at ¶

---

[16] During closing argument, Plaintiffs' counsel asserted that Defendants had not produced the financial records of the affiliated entities.  *See* ECF 99 at 51:13–52:3; *see also* ECF 96 at 93:15-20 (Stavros testimony); 61:2-11 (same).  If Defendants failed to turn over responsive documents, Plaintiffs had ample opportunity to raise this issue with the Court prior to the evidentiary hearing.  This Court ruled on numerous motions to compel throughout this case, almost universally in Plaintiffs' favor.  In September 2022, I granted Plaintiffs' motion to compel production of "[a]ny and all bank statements or account statements from all financial institutions for Usman Eshai a/k/a Uthman Eshai, Ali Eshai, and Najeeb Eshai where any and all payments, disbursements or distributions from Eshai Corporation, Eshai Corporation d/b/a Courier Distribution Systems LLC and/or Courier Distribution Systems LLC were made, transferred, or deposited for years 2017-2020, inclusive."  ECF 45-1 at ¶ 4 (motion); ECF 48 at ¶ 3 (order).  In March 2023, I ruled that Plaintiffs may inquire about "closely affiliated" entities including "CDS Staffing, LLC, Courier Distribution Systems, LLC, Deliverol Global, Inc., Postal Mile, and Endol Global Technologies, Inc." – specifically as to these companies' "financial dealings as related to Eshai" – and that "neither [Craig Pate] nor Wilson Lewis may refuse to answer on grounds of confidentiality or privilege."  ECF 59 at 2 (order); ECF 54-7 (motion).  In March 2022, I granted Plaintiffs' first motion to compel, ordering that, "[t]o the extent not previously produced, Defendants shall produce all responsive documents.  If there are no other

3. Given that this was a closely held family business, as discussed below, there is some plausibility to the distributions account serving as a catch-all category encompassing, among other things, payment of company debts. Most importantly, evidence is lacking that cash flowed to members of the Eshai family after Amazon pulled out.[17]

As noted at the outset, failure of a business does not by itself establish that it was undercapitalized at inception. Defendants are correct that Eshai's business model was inherently tenuous because of its reliance on a single client, and that this created challenges securing financing and resulted in its payment of high interest rates. Mr. Blanchard freely acknowledged that during his testimony. But a high-risk business can also seek the protection that comes from incorporation, and there is no evidence that Eshai misrepresented its business in applying for coverage. PMA is a sophisticated business enterprise that routinely assesses risk, and the vulnerability of Eshai's business model would have been self-evident. Eshai's push to expand may not have been prudent, but there are no indices of fraudulent intent. Eshai Corporation was unquestionably a legitimate business, and the mere fact that the company became insolvent has little relevance to the capitalization inquiry in the absence of evidence that distributions were used to defraud creditors.[18]

---

responsive documents, Defendants shall attest to this under oath." ECF 28 at ¶ 3 (order); ECF 22-2 (motion).

[17] Plaintiffs point to Usman's 2021 purchase of a $2 million house in cash (ECF 93 at 15:11-22), Ali's 2022 purchase of a $2.3 million house (with a mortgage) (*id.* at 118:13–119:15), and Najeeb's 2024 purchase of a $3 million house (*id.* at 136:2-8) as further evidence of self-dealing. Those are certainly facts of interest, but aside from identifying these purchases, Plaintiffs have presented no evidence linking them to wrongly diverted corporate funds. The record is insufficient to support a conclusion that "adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice." *Mortimer*, 255 A.3d at 287.

[18] Plaintiffs also asserts that Eshai Corporation's failure to reflect its $8.6 million liability to PMA on its balance sheet was relevant to establish the company's undercapitalization. The Stavros report stated that, "if Eshai's balance sheet had included PMA's entire $8.6 million premium liability [], their financial condition would have looked worse to anyone relying on their financial statements, including the subsequent insurer for policies that began in November 2019." *See* Stavros Report at 10. But the balance sheet was not prepared until a year later, in October 2020, by which time Eshai Corporation was in the process of winding up its affairs. It is difficult to discern how this is relevant to the time frame that is the

      *3. Eshai Corporation failed to adhere to corporate formalities, but the lack of observance did not contribute to abuse of the corporate form.*

Under Pennsylvania piercing law, "corporate formalities are relevant only where the lack of observance is associated with abuse of the corporate form." *Mortimer*, 255 A.3d at 276. This is particularly true with respect to closely held corporations, which are "not held to the strict formalities that are applicable to large corporations." *Chambers v. Beaver-Advance Corp.*, 140 A.2d 808, 814 (Pa. 1958); *see also Zubik*, 384 F.2d at 271 n.4 ("In the context of an attempt by an outside party to pierce the corporate veil of [] a closely-held corporation, the informalities are considered of little consequence"); *Lutyk*, 332 F.3d at 196 (a lack of formalities in closely-held corporations is "not a strong factor in favor of piercing the corporate veil"). Pennsylvania's Corporations Code specifically provides that "[t]he failure of a . . . limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a partner, member or manager of the entity for a debt, obligation or other liability of the entity." 15 Pa. C.S.A. § 8106.

Plaintiffs are correct that Eshai Corporation adhered to few (if any) corporate formalities. Eshai could not point to records of shareholder or board meetings, formal titles or bylaws, or policies as to the distribution of profits to shareholders. Formal loan documents were few. The most Defendants could argue was that Eshai Corporation held regular operational and planning meetings and were organized into multiple "departments" – Finance, Risk, and Fleet. But given that "Pennsylvania law imposes very few requirements upon limited liability companies" to observe corporate formalities, *Mortimer*, 255 A.3d at 276, and the Third Circuit's allowances for

---

focus here. And once again, Mr. Stavros conceded during the hearing that he "should correct the timing" of his report. *Id.* at 80:20–82:3.

family businesses, I cannot place significant weight on this factor in determining whether to pierce the veil.

### 4. Eshai Corporation did not substantially commingle corporate funds.

Plaintiffs contend that Eshai Corporation commingled funds between and among Eshai Corporation and other entities owned by members of the Eshai family, often without formal documentation.[19]  According to Mr. Stavros, this practice placed shareholders at risk, as the company "pa[id] money on behalf of these other entities with no loans, with no payback, with no interest."  ECF 96 at 98:7-8.  Defendants concede that funds flowed between Eshai Corporation and the related entities but contend that it did so because they were related companies engaged in the same business and serving the same customer, Amazon, or supporting the other Eshai entities also serving Amazon.  And all the transfers were documented on a general ledger and reviewed by outside accountants who reconciled the books.  Some of the transfers reflected Eshai Corporation's payments for vehicles, equipment, and insurance premiums on behalf of the related entities with minimal credit history – and the affiliated companies reimbursed Eshai Corporation for those payments.  ECF 93 at 57:14–59:21; 157:2-6 (Blanchard testimony).  Eshai would compile consolidated financial statements precisely because of the unified operation of the affiliated companies, but all the entities maintained their own books and records.  *Id.* at 214:1–215:10.

Mr. Stavros testified that he was concerned by the transfer of funds between entities that "don't have the same ownership."  ECF 96 at 71:6-9.  During the hearing, the parties quarreled over the meaning of "common ownership" and whether the concept has application in the context of an integrated family enterprise with affiliated companies engaged in the same business for the

---

[19] For example, Eshai Corporation loaned Deliverol $150,000 in January 2018 as an initial line of credit, but Ali testified that he didn't remember whether there was any documentation of the loan and could not recall whether Deliverol paid interest.  ECF 93 at 123:18–125:13.

same client.  The Stavros report stated that "the *only entity having common ownership with Eshai is CDS, LLC, the payroll company*."[20]  *See* Stavros Report at 8 (emphasis in original).  But Mr. Blanchard identified Eshai family members or Eshai entities as the owners of all the companies involved.  ECF 93 at 238:4-21.  He further testified that this was of direct benefit to Eshai Corporation itself, because Eshai "became a further flagship and deeper embedded into the Amazon world because of it."  *Id.* at 240:16-23.  And at the hearing, Stavros appeared to focus only on Deliverol, Postal Mile, and Cartage as companies with materially different ownership structures for purposes of the commingling analysis.  ECF 96 at 77:13–78:3.  But Deliverol and Postal Mile were owned by family members and the companies were engaged in the same business.  ECF 93 at 242:10-25.  More importantly, they were formed as different entities with different ownership structures at the behest of Amazon, *id.* at 237:8-23, because, somewhat ironically, Amazon did not want to concentrate too much of its package delivery with any one company.[21]  *Id.* at 235:12-16.  I view the transfers of funds between these entities to be of little consequence, as I find Mr. Blanchard's explanation to be persuasive and credible: they were operating in unison.

Cartage is in a different posture, as it serviced DHL, another parcel delivery company – not Amazon.  That relationship was sparked by Mr. Blanchard, and DHL, like Amazon, required the existence of a separate corporate entity.  *Id.* at 130:1–132:8; ECF 96 at 101:1-13.  But nothing

---

[20] It appears that "CDS, LLC" refers to CDS Courier Distribution Systems, LLC (and not to CDS Staffing).  *See* ECF 96 at 141:8-12.

[21] Ali testified that he continues to run Deliverol, which has evolved into a "managed staffing company" for Walmart.  He also continues to receive a salary from CDS Transnet.  ECF 93 at 119:16–120:25.

in the record indicates that Defendants transferred funds from the Amazon entities to Cartage for a fraudulent purpose.[22]

Plaintiffs also contend that Eshai Corporation deposited corporate funds into Usman's personal bank account. Specifically, Plaintiffs point to Eshai Corporation's $28,000 monthly interest payments on the Georgia United loan, whereby the company first transferred the funds to Usman, who then wired the money to the lender. ECF 96 at 31:11–33:2; *see also* ECF 93 at 78:10–80:8 (Usman testimony). But once again context is important. Eshai is organized as an S Corporation for tax purposes, ECF 93 at 207:20-25, and it relied on unconventional lenders because its dependence on a single client made it unattractive to most banks. *Id.* at 190:18–191:4. I view this atypical repayment process and poor documentation as weak accounting practice, but not as evidence of commingling.

Eshai Corporation and its affiliated companies plainly fell short of best practices in managing and tracking financial transfers between companies. But I cannot conclude based on the record that the intercompany transfers constitute "substantial commingling."[23] And any commingling of corporate and personal affairs cannot reasonably be characterized as having meaningfully contributed to a "unity of interest and ownership" between Eshai Corporation and Usman Eshai such that their "separate personalities . . . no longer exist." *Mortimer*, 255 A.3d at 286-87.

---

[22] The Stavros report also stated that Deliverol's pursuit of the DHL contract "removed all revenues generated [] that may have flowed to Eshai." *See* Stavros Report at 10. But on cross examination, Mr. Stavros admitted that Eshai Corporation was not itself permitted to seek the contract, rendering Deliverol's pursuit of the contract entirely appropriate. ECF 96 at 82:15–83:8; *see also* ECF 93 at 130:4-8 (Ali testimony).

[23] On cross, Mr. Stavros acknowledged that intercompany transfers are not always subject to loan documentation, stating that, while "it's not necessarily best practices not to have documentation," it was something that he had seen "lots of times" in his professional experience. ECF 96 at 72:18–73:3.

5. *Usman Eshai's purchase of high-end vehicles reflects a lack of foresight and sound judgment but does not by itself rise to a level that would justify disregarding the corporate entity.*

From 2017 to 2020, Usman used corporate funds to purchase twelve luxury vehicles, including a Lamborghini, a Rolls-Royce, and two Ferraris. The Stavros report stated that Defendants purchased two of these cars – a McClaren and a Mercedes Maybach – "*after being told they lost* the Amazon contract and *at the same time as receiving* PMA's premium audit invoice." *See* Stavros Report at 11 (emphasis in original). But purchasing agreements introduced during the hearing demonstrate that the McClaren was purchased in January 2020 and the Maybach was purchased on July 16, 2020, one day prior to receiving notice from Amazon. Defs. Trial Exs. 9, 10; *see also* ECF 93 at 91:10–93:25 (Usman testimony). Plaintiffs have done nothing to rebut this evidence, so I reject Mr. Stavros' theory as to when they were acquired. Moreover, Usman testified that the company owned only three to four of these vehicles at any given time for "marketing purposes" – to impress Amazon representatives, ECF 93 at 112:13-21; 95:9-20, and stated that the cars were never purchased outright, but rather were financed and then traded-in or sold, albeit often at a loss. *Id.* at 94:8–95:1. All the vehicles were liquidated following the termination of the Amazon contract. *Id.* at 86:10-21.

Nonetheless, the vehicles represent one of the more compelling of Plaintiffs' arguments. I reject Usman's testimony that the vehicles were needed to impress Amazon. Moreover, I am particularly troubled by Eshai Corporation's purchase of a Rolls Royce (and before that, a Bentley) for Najeeb, Usman's father, who had no involvement in the current operation of the business and who admitted that the cars were for his personal use. *Id.* at 144:16–146:25; 43:17–44:3 (Usman testimony). But the economic impact of these extravagances was comparatively minimal, and the record is now clear that the vehicles were not acquired when the business was *in extremis*, which would have far more significance had that been proven. As to the vehicle for Najeeb, once again

the family nature of the business explains, but does not necessarily excuse, his being provided that luxury, as he was the original founder of the business in which his children were (for a time) thriving. And the closeness of the Eshai family was certainly reflected by the record. But that comparatively minimal misuse of corporate assets by itself does not suffice to meet Plaintiffs' burden.

## IV.    Conclusion

Eshai was a niche business that sought to capitalize on the rise of online commerce and growing market demand for prompt delivery. Its dependence on a single client created inherent risks, as shown by the challenges it had securing traditional financing and its rapid demise when Amazon ruthlessly decided to take what it had learned and establish its own delivery network. The lure of rapid growth inured it to growing risk. But it never misrepresented its business, the risks of which would have been apparent to Plaintiffs. And its largest obligation to Plaintiffs – the $7 million retrospective surcharge – was first presented after Amazon gave notice of its intent to terminate.

Plaintiffs' forensic economist dropped one of his principal criticisms of Eshai's practices, and substantially retreated from others. The issues on which Eshai can most be faulted are more peripheral, and the record falls well short of establishing improper diversion of corporate assets. In the final analysis, the corporate veil in this case has some ragged edges, but it is not irreparably torn. There is an insufficient basis on which to enter judgment against Eshai shareholders personally.

  /s/ Gerald Austin McHugh  
United States District Judge